1
2
3
4
5                    UNITED STATES DISTRICT COURT
6                  NORTHERN DISTRICT OF CALIFORNIA
7
8    LUKE OLIVER,                          No. C 05-4393 MHP (pr)
9          Petitioner,                     **ORDER DENYING HABEAS
                                           PETITION**
10        v.
11   J. D. STOKES, warden,
12        Respondent.
     _____/
13
14                          **INTRODUCTION**
15         Luke Oliver, a prisoner at San Quentin State Prison, filed this <u>pro se</u> action seeking a
16   writ of habeas corpus under 28 U.S.C. § 2254.  This matter is now before the court for
17   consideration of the merits of the <u>pro se</u> habeas petition.  For the reasons discussed below,
18   the petition will be denied.
19                          **BACKGROUND**
20         The parties state that Luke Oliver was convicted in San Francisco County Superior
21   Court of first degree murder, rape, and a "crime against nature" and was sentenced to 7 years
22   to life in state prison in 1971.[1]  Oliver's habeas petition does not concern that conviction
23   directly, but instead focuses on a June 2, 2004 decision by a panel of the Board of Prison
24   Terms (now known as the Board of Parole Hearings ("BPH")) finding him not suitable for
25   parole.
26         The BPH identified several factors in support of its determination that Oliver was not
27   suitable for parole and would pose an unreasonable risk of danger to society or a threat to
28   public safety if he was released. The factors identified included the circumstances of the

United States District Court
For the Northern District of California

1

crime, his escalating pattern of violent and assaultive criminal conduct before the murder, his unstable social history, his limited in-prison programming, a mixed psychological evaluation, and an unfavorable board report.  The specifics regarding the crime and the circumstances supporting the finding of unsuitability are described in the Discussion section later in this order.

Oliver sought relief in the California courts.  The Marin County Superior Court denied his petition for writ of habeas corpus in 2005 in a reasoned decision.  Resp. Exh. 5.  The California Court of Appeal summarily denied his petition for writ of habeas corpus and the California Supreme Court summarily denied his petition for review.  Resp. Exhs. 6 and 7.

Oliver then filed his federal petition for writ of habeas corpus.  The court construed Oliver's federal petition for writ of habeas corpus to allege a due process violation based on the alleged absence of some evidence to support the BPH's decision and an ex post facto violation based on the alleged increase in punishment.  Respondent filed an answer. Petitioner did not file a traverse, and the deadline by which to do so has long passed.  The matter is now ready for a decision on the merits.

Petitioner filed an "affidavit and ex parte request for judicial notice" in which he stated that he had been found suitable for parole at his next parole hearing in 2006 and that the decision had been reversed by the California Governor.  The court need not judicially notice the materials because they are irrelevant to this action which concerns only the 2004 BPH hearing decision.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because Oliver was incarcerated and the challenged action occurred at San Quentin State Prison in Marin County, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state

1   judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

2   highest state court available with a fair opportunity to rule on the merits of each and every

3   claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not

4   dispute that state court remedies were exhausted for the claims asserted in the petition.

5                                        **STANDARD OF REVIEW**

6          This court may entertain a petition for writ of habeas corpus "in behalf of a person in

7   custody pursuant to the judgment of a State court only on the ground that he is in custody in

8   violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

9   The petition may not be granted with respect to any claim that was adjudicated on the merits

10  in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that

11  was contrary to, or involved an unreasonable application of, clearly established Federal law,

12  as determined by the Supreme Court of the United States; or (2) resulted in a decision that

13  was based on an unreasonable determination of the facts in light of the evidence presented in

14  the State court proceeding."  28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S.

15  362, 409-13 (2000).   Section 2254(d) applies to a habeas petition from a state prisoner

16  challenging the denial of parole.  See Sass v. California Board of Prison Terms, 461 F.3d

17  1123, 1126-27 (9th Cir. 2006).

18                                             **DISCUSSION**

19  A.     Ex Post Facto Claim

20         Oliver claims that the BPH's repeated denials of parole have violated his right to due

21  process and to be free from ex post facto laws because the BPH is using the determinate

22  sentencing law rather than the indeterminate sentencing law under which he was sentenced.

23         "To fall within the ex post facto prohibition, a law must be retrospective -- that is, 'it

24  must apply to events occurring before its enactment' -- and it 'must disadvantage the offender

25  affected by it,' . . . by altering the definition of criminal conduct or increasing the punishment

26  for the crime."  Lynce v. Mathis, 519 U.S. 433, 441 (1997) (citations omitted); see U. S.

27  Const. art. I, § 10.

28

1    Oliver's claim stems from California's change from an indeterminate sentencing law

2  ("ISL") to a determinate sentencing law ("DSL") in 1977.   Under the ISL, conviction for

3  most crimes resulted in an indeterminate sentence such as 1 year to life or life with the

4  possibility of parole, with the parole authority determining when the prisoner actually would

5  be released from prison.   See former Cal. Penal Code §§ 1168, 3020, 3041, 3046; In re

6  Duarte, 143 Cal.App.3d 943, 946-47 (Cal. Ct. App. 1983).   Under the DSL, there is a set

7  term of years as the punishment for most crimes; however, certain crimes continue to have

8  indeterminate sentences.  Among the crimes that continue to have indeterminate sentences

9  are non-capital murders and some kidnappings.  Oliver's claim is that the application of the

10  DSL parole laws and regulations to him are ex post facto violations.

11    The failure to set a parole date did not violate the Ex Post Facto Clause, U.S. Const.

12  art. I, § 10.  The ISL and DSL both required that the prisoner be found suitable for parole

13  before a parole date could be set.  See In Re Stanworth, 33 Cal. 3d 176, 183 (Cal. 1982).

14  And the ISL and DSL both used the same criteria for determining whether a prisoner was

15  suitable for parole.  See Connor v. Estelle, 981 F.2d 1032, 1033-34 (9th Cir. 1992); Duarte,

16  143 Cal.App.3d at 948-50.  The Ex Post Facto Clause was not violated because the laws and

17  regulations regarding suitability did not change to the detriment of prisoners.  Neither the

18  DSL nor the ISL imposed on the BPH an obligation to set a parole release date or consult the

19  sentencing matrix because Oliver has never been found suitable for parole.  Oliver is not

20  entitled to the writ on his claim that his rights under the Ex Post Facto Clause have been

21  violated.

22  B.    Insufficient Evidence Claim

23      1.    Due Process Requires That Some Evidence Support A Parole Denial

24    A California prisoner with a sentence of a term of years to life with the possibility of

25  parole has a protected liberty interest in release on parole and therefore a right to due process

26  in the parole suitability  proceedings.  See Sass, 461 F.3d at 1127-28; Board of Pardons v.

27  Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442

28  U.S. 1 (1979); Cal. Penal Code § 3041(b).

4

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision.  Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).  "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board.  Id. at 1128 (quoting Superintendent v. Hill, 472 U.S. at 455-56).  The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'"  Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457).  The some evidence standard of Superintendent v. Hill is clearly established law in the parole context for purposes of § 2254(d).  Sass, 461 F.3d at 1129.

A critical issue in parole denial cases concerns the BPH's use of evidence about the crime that led to the conviction.  Three Ninth Circuit cases provide the guideposts for applying the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v. Carey, 479 F.3d 658 (9th Cir. 2007).  Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability:  "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . .  A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."  Biggs, 334 F.3d at 916-17.  Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole."  Id. at 916.  Next came Sass, which criticized the Biggs statements as improper and beyond the scope of the dispute before the court:  "Under AEDPA it is not

our function to speculate about how future parole hearings could proceed." Sass, 461 F.3d at 1129. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the parole applicant's pre-offense behavior in determining parole suitability. See id. at 1129 (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). Recently, Irons determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence. Irons emphasized that all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." Irons, 479 F.3d at 665; see e.g., id. at 660 (inmate in 16th actual year of his 17-to-life sentence).

The message of these three cases is that the BPH can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs and Irons). Sass did not dispute the principle that, other things being equal, a criminal act committed 50 years ago is less probative of a prisoner's current dangerousness than one committed 10 years ago. Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to Biggs and Irons. Superintendent v. Hill's standard might be quite low, but it does require that the decision not be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.

Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies. One must look to state law to

1    answer the question, "'some evidence' of what?"

2            2.        State Law Standards For Parole For Pre-1978 Murderers In California

3            California uses indeterminate sentences for most non-capital murderers, with the term

4    being life imprisonment and parole eligibility after a certain minimum number of years.

5    Although the minimum term before parole eligibility was seven years when Oliver

6    committed the murder, a first degree murder conviction now yields a base term of 25 years to

7    life.  See In re Dannenberg, 34 Cal. 4th 1061, 1078 (Cal.), cert. denied, 126 S. Ct. 92 (2005);

8    Cal. Penal Code § 190.   The upshot of California's parole scheme described below is that a

9    release date normally must be set unless various factors exist, but the "unless" qualifier is

10   substantial.

11           A BPH panel meets with an inmate one year before the prisoner's minimum eligible

12   release date "and shall normally set a parole release date. . . . The release date shall be set in a

13   manner that will provide uniform terms for offenses of similar gravity and magnitude in

14   respect to their threat to the public, and that will comply with the sentencing rules that the

15   Judicial Council may issue and any sentencing information relevant to the setting of parole

16   release dates."  Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the

17   panel "shall set a release date unless it determines that the gravity of the current convicted

18   offense or offenses, or the timing and gravity of current or past convicted offense or offenses,

19   is such that consideration of the public safety requires a more lengthy period of incarceration

20   for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal.

21   Penal Code § 3041(b).

22           The current regulations for murders committed on or after November 7, 1978 are

23   found at 15 Cal. Code Regs. §§ 2400-2411.  The last paragraph of § 2400 states that the

24   regulations that apply to prisoners who committed murders before November 7, 1978 are

25   those in Article 5, i.e., 15 Cal. Code Regs. § 2280-2292.  The provisions largely parallel each

26   other but are repeated in two different articles to avoid confusion to the different groups of

27   prisoners.  "The suitability criteria are the same for both groups," although the term-fixing

28   provisions differ once the prisoner is found suitable.  15 Cal. Code Regs. § 2400 (last

7

1  paragraph).

2       Under the regulations, a parole date shall be denied if the prisoner is found to be

3  unsuitable under § 2281(c) and shall be set if the prisoner is found to be suitable under §

4  2281(d).  15 Cal. Code Regs. § 2280.  "A parole date set under this article shall be set in a

5  manner that provides uniform terms for offenses of similar gravity and magnitude in respect

6  to the threat to the public."[2]  15 Cal. Code Regs. § 2280.  "The panel shall first determine

7  whether a prisoner is suitable for release on parole.  Regardless of the length of time served,

8  a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel

9  the prisoner will pose an unreasonable risk of danger to society if released from prison." 15

10 Cal. Code Regs. § 2281(a).  The panel may consider all relevant and reliable information

11 available to it.  15 Cal. Code Regs. § 2281(b).

12      The regulations contain matrices of suggested base terms for several categories of

13 crimes, including first degree murder.  See 15 Cal. Code Regs. § 2282.  For example, for first

14 degree murders, the matrix of base terms ranges from a low of 8, 10, or 12 years to a high of

15 18, 20, or 22 years, depending on some of the facts of the crime.   Some prisoners estimate

16 their time to serve based only on the matrix.   However, going straight to the matrix to

17 calculate the sentence puts the cart before the horse because it ignores critical language in the

18 relevant statute and regulations that requires the prisoner first to be found suitable for parole.

19      The statutory scheme places individual suitability for parole above a prisoner's

20 expectancy in early setting of a fixed date designed to ensure term uniformity.  Dannenberg,

21 34 Cal. 4th at 1070-71.  Under state law, the matrix is not reached unless and until the

22 prisoner is found suitable for parole.  Id. at 1070-71; 15 Cal. Code Regs. § 2282(a) ("[t]he

23 panel shall set a base term for each life prisoner who is found suitable for parole").  The

24 California Supreme Court's determination of state law in Dannenberg is binding in this

25 federal habeas action.  See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).

26      The California Supreme Court also has determined that the facts of the crime can

27 alone support a sentence longer than the statutory minimum even if everything else about the

28 prisoner is laudable.  "While the Board must point to factors beyond the minimum elements

8

of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

> 3.    Some Evidence Supports The BPH's Decision In Oliver's Case

The BPH found Oliver unsuitable for parole based on the circumstances of the murder, his escalating pattern of violent and assaultive criminal conduct before the murder, his unstable social history, his limited in-prison programming, a mixed psychological evaluation, and an unfavorable board report.

> a.    Commitment Offense

The BPH relied upon the description of the murder as recited in the life prisoner evaluation report:

> On 2/25/70, Larry Oliver, brother of Luke Oliver, who resides at 19 Sharon Street, reported to Police that he entered his basement storeroom that morning and observed a nude female lying on a mattress. Thinking the female was asleep, he tried to wake her. After failing to do so, Larry determined the female was deceased. Larry recognized her as Marian Long, a tenant of the cottage to the rear of 19 Sharon Street. The autopsy [attributes] death to strangulation of a strong cord. There was evidence of rape due to tears on or about the vagina, and also evidence of entry into the rectum, with spermatozoa recovered from both the vagina and the rectum. . . .

> The circumstances of the offense are that Luke Oliver laid in wait for the victim, then grabbed her around the neck while armed with a butcher knife. He (Oliver) then took her to the basement of the apartment, where he raped and sodomized her. Oliver had tied the victim's legs with a cord. He also tied the cord around her neck. When the victim began to struggle, Oliver strangled her to death.

RT 12-14; Resp. Exh 3, pp. 1-2. Oliver's version of the crime as described in the life prisoner evaluation report also was read into the record.

> "I take full responsibility for the crime. My intention was never to kill her. I only would have raped her until she screamed. When she screamed I tried to cup her mouth and laid on top of her. The cord that was tied to her ankle and neck was under me while I laid on her and that is what caused the cord to tighten up and strangle her. I feel very remorseful and I will always show my remorse. My biggest concern is

9

1  what her family has gone through because of this.  [¶] I still regret the crimes I had
2  committed and feel responsible for my past behavior and accept the impact of the
   consequences."

3  RT 14-15; Resp. Exh. 3, p. 2.

4      A circumstance tending to indicate unsuitability for parole is that "the prisoner

5  committed the offense in an especially heinous, atrocious or cruel manner."  15 Cal. Code

6  Regs. § 2281(c)(1).  The factors to be considered in determining whether that circumstance

7  exists are that there were multiple victims, "[t]he offense was carried out in a dispassionate

8  and calculated manner, such as an execution-style murder," "[t]he victim was abused, defiled

9  or mutilated during or after the offense," "[t]he offense was carried out in a manner which

10  demonstrates an exceptionally callous disregard for human suffering," and "[t]he motive for

11  the crime is inexplicable or very trivial in relation to the offense."  15 Cal. Code Regs. §

12  2281(c)(1).

13      The BPH relied on the commitment offense to deny parole, finding that it was "carried

14  out in an especially cruel and a very callous manner."  RT 54.  Oliver had laid in wait for the

15  victim, forced her at knifepoint to the basement where he raped and sodomized her, hogtied

16  her and strangled her.  The BPH was skeptical of Oliver's assertion that the victim's death

17  was unintentional, as the way Oliver tied the victim and set his weight on her seemed to

18  make her death inevitable.  <u>See</u> RT 61.  The BPH also noted that Oliver's motive of sexual

19  gratification was trivial in relation to the crime.  The BPH identified more than the minimum

20  elements of a first degree murder when it determined that the facts of the murder showed

21  Oliver's unsuitability for parole.

22         b.  <u>Prior Criminality</u>

23      The BPH is directed by the regulation to consider all relevant and reliable information

24  in determining suitability for parole, including the prisoner's "past criminal history, including

25  involvement in other criminal misconduct which is reliably documented."  15 Cal. Code

26  Regs. § 2281(b).  Among the specific circumstances listed as tending to indicate unsuitability

27  is a previous record of violence, such as if the prisoner had "on previous occasions inflicted

28  or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated

1    serious assaultive behavior at an early age."  15 Cal. Code Regs. § 2281(c)(2).

2           Oliver had a serious criminal history before the commitment offense, including

3    several sexual assaults.  He was arrested at age 14 for burglary and was sent to a youth

4    guidance center.  RT 15.  He was arrested in 1963 (at about age 15 or 16) for his involvement

5    in raping a 13-year old girl; the charge was reduced to "attempted sexual relation, danger of

6    morality," according to him, and he was put on probation after a stay at the youth guidance

7    center.  RT 16, 38.  He was arrested in 1966 for a curfew violation and received a 30-day

8    probation term.  His criminal activity worsened as an adult.  In 1967, he was arrested for rape

9    and received a 6-month jail sentence and a 2-year probation term.  RT 18.  He violated the

10   probation for that offense when he committed the murder in this case.  In 1968, he was

11   arrested for a kidnapping.  He was required to register as a sex offender.  In 1969, he was

12   arrested for assault with intent to kill, which was resolved when he pled guilty to carrying a

13   loaded firearm in his vehicle.  RT 19.  In 1967, he was arrested for being drunk in and about

14   an automobile, for which he received a 5-day jail sentence and a fine.  In 1970, he committed

15   the murder at issue here.

16          The BPH considered a circumstance proper under California law in finding that

17   Oliver's criminal record showed he was unsuitable for parole.  Oliver's criminal record was

18   quite serious and included several sexual assaults.  See, e.g., RT 38, 39, 42.  A prisoner's

19   sexual assaults committed "in a manner calculated to inflict unusual pain or fear upon the

20   victim" also tend to indicate unsuitability.  15 Cal. Code Regs. § 2281(c)(4).  The fact that

21   the commitment offense was committed while he was on probation and after several stays in

22   custody indicated he had failed to profit from society's previous attempts to correct his

23   criminality.  Oliver's prior criminality was part of the overall picture of him that the BPH

24   properly considered in determining whether he was suitable for parole.

25                  c.      Unstable Social History

26          The BPH also relied on Oliver's unstable social history and family difficulties in

27   reaching its decision.  Oliver had observed his father molesting his sister and his mother

28   having relationships with her boyfriends.  RT 20-24, 56.  He also had an alcohol problem.

11

RT 21-23.  An unstable social history is specifically listed as a circumstance tending to indicate unsuitability, see 15 Cal. Code Regs. § 2281(c)(3), so it was a proper factor to consider.  The presence of these facts alone would not alone support a finding that an inmate was unsuitable for parole, but it could be considered as a little bit of evidence in determining the overall picture of Oliver.  "Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability."  15 Cal. Code Regs. § 2281(b).

c.    Institutional Performance

Section 2281(b) specifically allows the BPH to consider a great range of relevant and reliable information, such as the prisoner's social history and mental state.  The BPH also may consider evidence that the "prisoner has engaged in serious misconduct in prison or jail" as tending to indicate unsuitability for parole.  15 Cal. Code Regs. § 2281(c)(6).

Oliver had been incarcerated for 34 years and a largely favorable prison record.  He had completed high school in prison, received an A.A. degree, and was waiting to participate in a B.A. program.  RT 24.  He had a very good disciplinary record.  He apparently had only one CDC-115 in his 34 years, issued in 1984 for possession of marijuana.  RT 27.  He also had received a CDC-128 counseling memorandum for a lesser rule transgression in the early 1970s.  RT 27.  He had excellent work reviews in his jobs and was currently the lead man in the upholstery department of the PIA.  He also had received a lot of vocational training.  RT 25.  The BPH nonetheless concluded that he had programmed "in a fairly limited manner" for the amount of time he had been in prison and felt that he had not sufficiently participated in beneficial self-help or therapy programs.  RT 57.  Oliver does not show that this finding was not supported by the record.  Although Oliver had participated in many programs, see RT 26, the panel apparently thought he needed more self-help programming and was concerned that he had not fully come to grips with the extent of his responsibility for the crimes and had tended to minimize his assaultive conduct.  See RT 61.

The BPH also was concerned about the psychological reports that it considered "really very disturbing in that they are either contradictory or not totally supportive of release."  RT

12

57.  The psychological diagnoses for Oliver were sexual sadism in remission, alcohol abuse in institutional remission, and antisocial personality disorder.  Resp. Exh. 4, p. 5.  He also had some current cognitive distortions consistent with the diagnosis of sexual sadism.  RT 57; Resp. Exh. 4, p. 3.  The psychologist rated Oliver's future risk of violence as low and his future risk of sexually offending as low to low-moderate.  RT 31; Resp. Exh. 4, pp. 7, 8.  The psychologist recommended that, if he was paroled, testing should be done to tailor treatment, if necessary, towards specific treatment for deviant sexual arousal.  RT 32; Resp. Exh. 4, p. 7.  The BPH could rely on the less-than-glowing psychological report, as the regulations permit it to consider the inmate's "past and present mental state."  See 15 Cal. Code Regs. § 2281(b).

d.    There Was Enough Evidence To Support The Decision

Oliver had been in custody a very long time, but the rape-murder he committed was extremely brutal and was but one of several assaultive criminal acts including several sexual assaults.  Some of his pre-incarceration criminality appeared connected to his sexual sadism which was in remission at the time of his evaluation by the psychologist in 2004.  The BPH also had before it evidence that the psychologist opined that Oliver had a low to low-moderate risk of sexually re-offending if released from custody.  And the BPH was concerned with his apparent need to continue self-help work to come to grips with his role in the sexual assault as his "slant" was to minimize his behavior and actions.  See RT 61.  As the BPH said, there were "red flags" in Oliver's psychological report.  RT 58.

The Marin County Superior Court's decision is the last reasoned decision, and therefore is the decision to which § 2254(d) applies.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005), cert. denied, 126 S. Ct. 2041 (2006).  The Marin County Superior Court correctly identified the "some evidence" standard as the standard for judicial review of BPH decisions.  See Resp. Exh. 5, p. 5.  The court reasonably applied that standard as it wrote: "It appears to this court that this parole board did precisely what the [California] Supreme Court expected of it: the board pointed to particular circumstances of petitioner's crime – beyond the minimum elements of

13

his conviction – which indicated exceptional callousness and cruelty, with trivial provocation, and thus concluded that petitioner remains a danger to public safety.  [¶] Accordingly, this court cannot conclude that the board in this instance acted arbitrarily or capriciously.  Moreover, upon a review and consideration of the evidence presented at the parole hearing, this court must conclude that there was presented, at least, "*some evidence*" to support the board's decision to deny parole and that the board reviewed and considered pertinent criteria in making its determination that petitioner was, at the time, unsuitable for parole."  Id.  The Marin County Superior Court's rejection of Oliver's insufficient evidence claim was not contrary to or an unreasonable application of the Superintendent v. Hill some evidence standard.  Oliver is not entitled to the writ.

### CONCLUSION

For the foregoing reasons, the petition is denied on the merits.  The clerk shall close the file.

IT IS SO ORDERED.

DATED:   May 31, 2007

Marilyn Hall Patel
United States District Judge

14

1

## <u>NOTE</u>

2

1.      The abstract of judgment differs from the parties' description in that it does not mention a crime against nature and instead indicates that Oliver was convicted of first degree murder, kidnapping, assault with intent to commit rape, and first degree robbery in San Francisco County Superior Court in 1970 and assault with intent to commit rape in 1970 in San Mateo County Superior Court.  Resp. Exh. 1.  Oliver apparently was on probation for the San Mateo crime when the rape and murder took place in San Francisco.  <u>See</u> RT 18.

2.      The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2281(c).  The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2281(d).

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28